UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALEXIS WELLS, | ) | |
| | ) | |
| Wells, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-47-JRS-MPB |
| | ) | |
| THE FREEMAN COMPANY, and | ) | |
| TIMOTHY VAUGHN, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motion for Summary Judgment**

This is a sexual harassment, sexual battery, and wage dispute case.  Alexis Wells,

alleges that Defendant, Timothy Vaughn, sexually assaulted her.  Wells alleges that

this conduct occurred while she worked for Vaughn, who was at the time employed

by Codefendant, the Freeman Company ("Freeman").  Against Freeman, Wells brings

claims of Hostile Work Environment Sexual Harassment and Quid Pro Quo Sexual

Harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Additionally, Wells seeks wage payments from Freeman under Ind. Code § 22-2-5-1

and alleges that both Defendants are liable to Wells under theories of intentional and

negligent infliction of emotional distress ("IIED" and "NIED," respectively).  Against

Vaughn in his individual capacity, Wells brings claims of battery and sexual battery.

Vaughn brings counterclaims for defamation and tortious interference.  Currently

before the Court is Vaughn's Motion for Summary Judgment, (ECF No. 140),

Freeman's Motion for Summary Judgment, (ECF No. 148), and Wells' Motions for

Summary Judgment, (ECF Nos. 168 & 174).  For the following reasons, Freeman's

Motion for Summary Judgment, (ECF No. 148), is **granted**; Vaughn's Motion for Summary Judgment, (ECF No. 140), is **granted in part and denied in part**; and Wells' Motions for Summary Judgment, (ECF Nos. 168 & 174), are **denied**.

## I.    Background

A brief background is necessary for context, but additional facts are provided as needed throughout this opinion.

Timothy Vaughn was hired by Freeman in April 2015 in the role of Client Solutions Manager. (Vaughn Dep. Tr. 29:18–30:7, ECF No. 148-1.) Vaughn was responsible for working with Freeman's clients by overseeing the execution of their company events. (*Id.* at 30:11-20, 31:17–32:8.) Freeman's onboarding process for new employees is extensive, typically involving 60 days of training on various systems/processes, including training regarding human resources, ethics, and Freeman's Employee Handbook. (*Id.* at 72:17–75:18.)

Vaughn has been a close friend of Wells' family for most of her life. (Wells Dep. Tr. 26:19–27:1, ECF No. 148-3.) Vaughn's family and Wells' family attended church together, went on vacations together, and had game/movie nights together throughout her childhood and into early adulthood. (Vaughn Dep. Tr. 24:11-13, ECF No. 148-1; Wells Dep. Tr. 143:24–144:3, ECF No. 148-3; Wells Aff. ¶ 2, ECF No. 148-1.) During and after Wells' senior year of high school, Vaughn began discussing modeling opportunities with her. (Vaughn Dep. Tr. 329:20-25, ECF No. 169-1.) Vaughn asked Wells to send him her body measurements so he could track her progress; he also asked for Wells to send pictures of herself in activewear. (Wells Aff.

¶ 5, ECF No. 171-1.)   Vaughn indicated to Wells the possibility of modeling opportunities with certain brands (e.g., PINK).  (Vaughn Dep. Tr. 330:11-21, ECF No. 169-1.)  Vaughn additionally had numerous interactions with Wells via text wherein he asked Wells to send him pictures (some partially nude) of herself in sleepwear and lingerie, purportedly for other modeling opportunities.  (*See, e.g.*, ECF No. 123-1.)

In the fall of 2019, Freeman received a proposal from Veeva Systems Inc. ("Veeva") seeking Freeman's technical and creative support for its annual field kick-off event in Orlando, Florida.  (ECF No. 148-2 at 141.)  The event was set to occur from January 20 through January 26, 2020.  Lisa Van Rosendale ("LVR"), Freeman's Account Director for Veeva, assigned numerous employees and contractors with leading the execution of the event.  (Vaughn Dep. Tr. 90:11–91:25, ECF No. 148-1.)  Vaughn was asked to help oversee the Veeva event in Orlando.  (*Id.*)  On January 1, 2020, Vaughn approached Wells about the possibility of working on the Veeva event as a Production Assistant ("PA").  (Wells Dep. Tr. 56:13-19, ECF No. 148-3.)  Wells agreed.  (*Id.* at 57:3–58:2.)  Despite this, Wells was never onboarded through Freeman's new-hire procedure.  (*See, e.g.*, *id.* at 77:13-16, 77:20-25, 96:12-21, 99:16–100:4, 100:5-20.)

Wells flew to Orlando on January 19, 2020, to assist Vaughn at the Veeva event.  (*Id.* at 119:22–119:1.)  On the first night, Wells and Vaughn went to dinner with a colleague.  (*Id.* at 131:4–132:25.)  Vaughn and Wells had numerous alcoholic drinks (at least seven each) during dinner.  (Vaughn Dep. Tr. 243:10-16, ECF No. 169-1; Ex. 113, ECF No. 148-2 at 163.)  At the end of the evening, Vaughn followed Wells to her

hotel room.  It is at this point that Wells and Vaughn's version of events materially differ.

Vaughn claims he followed Wells to her hotel room after she invited him up to look at the clothing she brought to wear for the Veeva event.  (*Id.* at 245:6-21.)  While there, and after she undressed to "get showered and ready" for the next day, Vaughn alleges that Wells asked him to take photos of her while in the bathtub.  (*Id.* at 246:9-19.)  After doing so, and noticing that Wells was falling asleep in the tub, Vaughn claims he helped Wells out of the tub, into some clothes, and into bed.  (*Id.* at 246:21-23.)

Wells' version of the story is significantly different.  Wells testified that after dinner, Vaughn asked her if she wanted to take updated modeling photographs. (Wells Dep. Tr. 160:17–161:5, 237:25–238:3, ECF No. 148-3.)  After entering Wells' hotel room, Vaughn allegedly looked through Wells' underwear and told her to put on a thong he had found.  (*Id.* at 161:18-23.)  Upon instruction, Wells began to pose for Vaughn, who took pictures of her.  (*Id.* at 165:13-18.)  Vaughn focused on Wells' vaginal area and told her that she needed to shave it.  (*Id.* at 165:14-18.)  Wells reluctantly obliged and went to the bathroom to shave.  (*Id.* at 167:18-25.)  After Wells was inside the bathtub, Vaughn allegedly took Wells' razor and shaved her genital area.  (*Id.* at 167:18-25.)  Additionally, Vaughn reached into the bath water and groped her vagina.  (*Id.*)  Vaughn then spread Wells' legs and took a close-up picture of her vagina.  (*Id.* at 170:1–172:25.)  After taking Wells to bed for a "massage,"

Vaughn allegedly groped Wells' genitals again numerous times.  (*Id.* at 175:7–176:14, 177:1-7.)

On April 6, 2020, Wells sent a twenty-page letter with thirty-eight pages of attachments to Freeman's Chief Legal Officer, Dawnn Repp, and Chief People Officer, James Gibbs, discussing Vaughn's alleged sexual assault of her.  (ECF No. 76-12.) Wells likewise filed an EEOC charge on June 26, 2020, reciting the same allegations. Wells filed her original Complaint, (ECF No.1), in this Court on March 5, 2021.  The operative complaint in this case is Wells' Second Amended Complaint, (ECF No. 122), filed May 23, 2022.  There, Wells brought Title VII and wage payment claims against Freeman, IIED/NIED claims against both Freeman and Vaughn, and battery and sexual battery claims solely against Vaughn.  Freeman did not assert any counterclaims, but Vaughn brought counterclaims against Wells for defamation *per se* and tortious interference with a business relationship.  (Vaughn Answer, ECF No. 130.)

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court views the evidence "in the light most

favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The Court need consider only materials cited by the Parties but may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).

### III.   Discussion

While there is some overlap in their defenses, Freeman and Vaughn largely rely on separate arguments in their respective motions, as does Wells with regards to each Defendant.  For this reason, the Court will address each Defendant's liability in turn.

### A.  Freeman

Freeman makes several arguments that it cannot be liable as a matter of law for Wells' employment claims; additionally, Freeman argues it cannot be liable for IIED or NIED.  The Court addresses Freeman's arguments and Wells' counterarguments in turn.

#### 1.  Wells' Employment Claims Against Freeman

Wells asserts three claims against Freeman arising under an employer-employee relationship: (1) Hostile Work Environment Sexual Harassment under Title VII, (2) Quid Pro Quo Sexual Harassment under Title VII, and (3) Wage Payment under Ind. Code § 22-2-5-1.  (Second Am. Compl. ¶¶ 308–26, ECF No. 122.)  To succeed on these claims against Freeman, Wells must first establish that she was Freeman's "employee."  *See Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991) ("Independent contractors are not protected by Title VII."); *Snell v. C.J. Jenkins Enters., Inc.*, 881 N.E.2d 1088, 1090–91 (Ind. Ct. App. 2008) (explaining that

a plaintiff must qualify as an "employee" to recover under Ind. Code sections 22-2-5 and 22-2-9).

i.      Vaughn's authority to hire Wells.

On this issue, Freeman first argues that no employment relationship could have existed because Vaughn lacked the authority (express, implied, or apparent) to hire Wells on behalf of Freeman.  (Freeman Br. Supp. Mot. Summ. J. 14, ECF No. 149.) Freeman additionally argues that Wells "failed to address . . . arguments about the absence of Vaughn's authority, and her silence on the issue amounts to waiver." (Freeman Reply 3, ECF No. 182.)  The Court disagrees.

An agent can bind its principal through three types of authority: (1) express authority, (2) implied authority, or (3) apparent authority.  *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016).  "An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act."  *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) (cleaned up).  "[A]n agent has implied authority for the performance or transaction of anything reasonably necessary to effective execution of his express authority."  *Id.* (cleaned up). The Court need not reach apparent authority.

Freeman's argument that Wells did not address Vaughn's authority in her Response is incorrect.  While Wells did not have a separate section on this issue, in her argument related to Vaughn's role as a supervisor, she adequately pointed to evidence in the record suggesting that Freeman authorized Vaughn to hire Wells for the Veeva event.  (*See* Pl.'s Resp. 39, ECF No. 170.)  Specifically, LVR, as lead

Freeman manager over the Veeva event, had the authority to assign work to Vaughn. (Vaughn Dep. Tr. 92:1-93:1, ECF No. 148-1.) And multiple individuals confirmed that LVR approved Vaughn's recommendation to hire Wells for the PA position. (Vaughn Dep. Tr. 218:14-25, 219:1-13, ECF No. 169-1; Mantha Aff. ¶6-7, 10, ECF No. 76-30.) LVR's January 16, 2020, email response to Vaughn regarding the retaining of Wells as a PA and makeup artist further supports this finding. (Mantha Aff. Ex. 3, ECF No. 76-30 (showing LVR's tentative approval of the addition of Wells as a PA and makeup artist).) If not an express authorization for Vaughn to hire Wells, this was at least an implicit one. Freeman argues that LVR's response in this email "says nothing about Vaughn being empowered to hire" Wells or anyone else.[1] (Freeman Reply 15, ECF No. 182.) The Court fails to see how this is the case. The lead Freeman manager over the Veeva event, LVR, is told about Wells' potential hiring to be a PA and makeup artist; LVR then allows Vaughn to move forward with the hiring process pending approval of costs. Freeman points to other citations in the record of individuals (including Vaughn himself) stating that Vaughn did not have the authority to hire anyone and that he had no supervisory responsibilities. (*Id.* at 14–15.) Even if that may generally be the case, the record indicates that, at the least, Vaughn implicitly was authorized by LVR to hire Wells for the Veeva event. But Freeman argues that nothing in LVR's email suggested that Vaughn could circumvent Freeman's normal process for hiring new employees/independent contractors for its events. (*Id.* (discussing Freeman's established hiring process.))

---

[1] This argument was made in a separate section of Freeman's brief focusing on Vaughn's role as a supervisor; however, the arguments are relevant for the issue at hand.

Yet, LVR is told of Wells' incoming role by Vaughn and then conditionally approves bringing Wells on for the Veeva event; at that point, it is within Vaughn's authority to complete the hiring process.

Accordingly, the Court finds that Vaughn had the authority to hire Wells on behalf of Freeman.

ii.    Employment relationship.

Freeman next argues that it cannot be liable for any of Wells' employment-related claims because there was never a "meeting of the minds" as to the terms of an employment contract between Wells and Freeman; thus, no employment relationship was ever established.  (Freeman Br. Supp. Mot. Summ. J. 15–16, ECF No. 149.)  In response, Wells seems to focus her argument on the *nature* of her relationship with Freeman (i.e., "independent contractor" or "employee") without addressing Freeman's claim that no employment relationship ever existed in the first place.  (Freeman Reply 3, ECF No. 182.)  For example, Wells chiefly relies on language from the following cases to support her argument that federal courts use the "economic realities" test to determine whether an employer-employee relationship exists under Title VII:  *Silic v. BBS Trucking, Inc.*, No. 12 CV 6557, 2014 WL 4783849, (N.D. Ill. Sep. 24, 2014); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991); *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697 (7th Cir. 2015); *Smith v. Chi. Sun-times, Inc.*, No. 06 C 6142, 2007 WL 2278889 (N.D. Ill Aug. 6, 2007); *Brown v. City of North Chicago*, No. 04 C 1288, 2006 WL 1840802 (N.D. Ill. June 28, 2006); *EEOC v. Catholic Knights Ins. Soc'y*, 915 F. Supp. 25 (N.D. Ill. 1996).  (*See* Pl.'s Reply 2, ECF No. 185.)  While the "economic realities" test is indeed useful (and necessary)

9

in determining whether someone is an "employee" under Title VII, this determination is specifically made in the context of delineating whether an individual is an "independent contractor" or an "employee."   In other words, this determination is being made *after* a working relationship has already been established between two parties (and, because the relevant parties in these types of cases almost always have a clear oral or verbal contract, this is typically not a litigated issue).   This is, in fact, the context in *every* case cited by Wells.   *See, e.g.*, *Silic*, 2014 WL 4783849, at \*2; *Knight*, 950 F.2d at 378–79; *Love*, 779 F.3d at 702; *Smith*, 2007 WL 2278889, at \*2; *Brown*, 2006 WL 1840802, at \*5; *Catholic Knights*, 915 F. Supp. at 28 (emphasis added) ("In determining whether a *hired party* is an employee . . . we consider [the economic realities test.]").   *Cf. Holder v. Town of Bristol*, No. 3:09-CV-32 PPS, 2009 WL 3004552, at \*3 (N.D. Ind. Sep. 17, 2009) (discussing the inapplicability of the "economic realities" test for the relevant facts because "the question isn't so much whether Holder is an independent contractor as opposed to an employee, but whether he is a volunteer or an employee").

Before analyzing whether a hired party is an independent contractor or employee, the establishment of the contractual relationship between the purported employer and purported worker is a threshold question (and often an obvious and ignored one) that must be determined.   Aside from some situations not relevant to the facts here, "*[o]nce a contractual relationship of employment is established*, the provisions of Title VII attach and govern certain aspects of that relationship."   *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984) (emphasis added).   As discussed above, the existence

of an employment relationship is also a prerequisite for recovery under Indiana wage statutes. *Snell*, 881 N.E.2d at 1090–91. "The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction." *Perrill v. Perill*, 126 N.E.3d 834, 840 (Ind. Ct. App. 2019) (citation omitted). Wells needs to show the existence of all of these elements to establish a contractual employment relationship with Freeman. *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994) ("[T]he party urging the validity of a contract bears the onus of proving its existence."). In the context of employment agreements, whether oral or verbal, "the parties must agree to all terms of the contract." *See Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 883 (Ind. Ct. App. 2000) (citation omitted). "A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Id.* (citation omitted). A party may not "unilaterally bind another to a contract of employment." *Black v. Emp. Sols., Inc.*, 725 N.E.2d 138, 142 (Ind. Ct. App. 2000). Simply put, the evidence must "show a *mutual intent* of the parties to establish an employer-employee relationship." *Id.* at 143 (emphasis added). Terms of an employment agreement that are essential include the salary or compensation of the employee, the scope of the employee's work duties, and the duration of the employment. *See* 2 A. Corbin, *Corbin on Contracts* § 501 at 705 (1950) (emphasis added) ("In contracts for the sale of lands or goods, *or for the rendition of services*, the price to be paid in exchange is as much the subject matter of the contract as is the land, the goods, or the services, and is of equal importance in the transaction.");

11

*Williams v. Riverside Cmty. Correcitons Corp.*, 846 N.E.2d 738, 744 n.5 (Ind. Ct. App. 2006) (noting that in employment-at-will agreements, the employee's hourly or salary wage serves as the consideration underlying the contract); *Gilinsky v. Sarbro Realty Corp.*, 138 A.D.2d 823, 824 (N.Y. App. Div. 1988) ("The essential elements of an employment contract are the parties to the contract, the position to be assumed, the salary or compensation to be received and the duration.").

While there is evidence of some communication between Freeman employees of potentially hiring Wells, and while Wells likely did complete some work that ultimately benefited Freeman (mainly administrative tasks assigned to her by Vaughn), the record indicates that there was no meeting of the minds between Wells and Freeman on any terms of an employment contract, and the Court finds no genuine dispute as to the material facts surrounding this issue.  Indeed, although some Freeman employees knew of Wells' potential employment for the Veeva event, (*see e.g.*, Mantha Aff. Ex. 3, ECF No. 76-30), Wells admits that she and Freeman did not agree on (1) a salary or hourly rate, (2) whether Wells was to receive any employment benefits, (3) the duration of her employment with Freeman, (4) whether she was an independent contractor or employee, and (5) the scope of Freeman's policies, procedures, and codes of conduct.  (Wells Dep. Tr. 71:16-22, 96:12-15, 98:11-15, 99:12-15, 100:5-20, 199:11-200:24, ECF No. 148-3.)  Wells did not even inquire into more specifically defining these terms.  (*Id.* at 200:14-15.)  Additionally, Wells was never interviewed, (*id.* at 77:17-19), never received an offer letter or any document memorializing her employment with Freeman, (*id.* at 77:20-25), never

completed any relevant IRS employment forms, (*id.* at 100:5-20), never executed an independent contractor agreement of any kind, (*id.* at 99:12-15), and never received any training from Freeman aside from a 20-minute session from Vaughn regarding Excel spreadsheet comparison, (*id.* at 94:18–95:8).  It is difficult for the Court to find the establishment of any formal working relationship at all, and Wells herself admits a lack of agreement as to any of these essential terms.  Even with Vaughn's implied authority to hire her, there is no indication of an agreement on any terms of employment.  For instance, as to the most crucial term of an employment contract, compensation, Wells points to a singular email to which she was not even a party where Vaughn told LVR that Wells' cost would be "minimal per day $50 hour." (Mantha Aff. ¶ 10, ECF No. 76-30 at 2–3, 6–7 (email showing LVR asking Vaughn to get those "costs," which include Wells' cost, approved by Freeman).)  But this does not indicate any meeting of the minds between Wells and Freeman, especially since Wells has no idea what wage she was to be paid.  (Wells Dep. Tr. 71:16-22, ECF No. 148-3.) There is similarly no evidence of agreement as to any other terms of employment.  In short, while Wells needed to point to evidence showing (1) an offer for employment, (2) an acceptance of employment, (3) consideration, and (4) a meeting of the minds as to pertinent terms; at best she arguably did so only as to the first two elements, albeit minimally.  Neither did she show or even argue for the existence of an informal contract, s*ee e.g.*, *Hishon*, 467 U.S. at 74, resulting in waiver of any such theory.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

Finding that there was no meeting of the minds between Wells and Freeman as to any employment agreement (and thus no existence of an employer-employee relationship between the two parties), the Court must **grant** Freeman's Motion for Summary Judgment as to Wells' Title VII and Ind. Code 22-2-5-1 employment claims.

iii.      "Independent Contractor" vs. "Employee"

For the sake of tying up any potential loose ends, the Court notes that even if a contractual relationship had existed between Freeman and Wells, the Court then would find that Wells was an independent contractor who was not subject to the protections of Title VII and the Indiana wage payment statutes.  As discussed above, the Seventh Circuit uses the factors set forth in the "economic realities" test to determine whether a party is an "employee" or an "independent contractor" in the Title VII context; namely:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Knight*, 950 F.2d at 378–79 (citations omitted).  The employer's right to control is the most important factor.  *Id* at 378.

As to the most important factor, the extent of the employer's control, Wells misreads the law.  In both her Response and Reply, (Pl.'s Resp. 33–34, ECF No. 170; Pl.'s Reply 3, ECF No. 185), Wells heavily relies on language in *Love* wherein the Seventh Circuit held that "when control is examined, 'the key powers are, naturally, those of hiring and firing.'" 779 F.3d at 703 (quoting *EEOC v. Illinois*, 69 F.3d 167,

171 (7th Cir. 1995)).  However, in both *Love* and *EEOC*, the Court was applying the "right to control" factor to determine who the *employer* was between two different entities.  In other words, those cases dealt with situations where the employed party worked for two or more separate entities, and where, as a result, there was ambiguity as to who the employer actually was for purposes of Title VII.  *See id.* at 703–04 (determining whether correct employer was UCI or Cullen); *EEOC*, 69 F.3d at 171. Further, this emphasis on hiring and firing makes sense in such a context, as the employer with this power is more likely the relevant one for Title VII purposes.  On the other hand, it would not be rational to focus on hiring/firing in differentiating between an employee and an independent contractor working for a single entity.  An employer would naturally have the power to hire and fire *both* types of workers.  The real focus for this factor should be on "[i]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the *details* by which that result is achieved." *Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001) (emphasis added) (citation omitted).  In this case, it was Wells, not Freeman, who set her own work hours.  (Wells Dep. Tr. 94:2-2, ECF No. 148-2.)  Wells' bold assertion that Vaughn told her "what to do, how to do it, where to do it, and who to do it with," (Pl.'s Resp. 34, ECF No. 170), relies on citations to the record that seem to tell a different story.  The record indicates that the entirety of Wells' job, whether during the days leading up to the Veeva event or at the Veeva event itself, entailed random tasks assigned to her by Vaughn:  comparing Excel spreadsheets, (Vaughn Dep. Tr. 206:18-22, ECF No. 169-1), planning top golf outings, (Wells Dep. Tr. 185:19–

186:18, ECF No. 148-3), and comparing pictures of room layouts, (*id.* at 187:12-25). Aside from minor instruction, Wells seemed to do this work on her own, at her own time, and at her own discretion. (*See id.* at 202:2-5 (Wells discussing never receiving feedback on her work).) The Court therefore finds that this crucial factor favors independent contractor status.

The second factor, the level of skill required, is neutral. As discussed above, Wells' job mostly entailed working with Excel, comparing diagrams and lists, and planning events. Such responsibilities do not require a specialized level of skill. Also, aside from Vaughn's brief Excel overview, Freeman provided Wells with no training, and Wells' general skills for this type of work had already been learned through prior experiences. (*Id.* at 28:23–29:4 (discussing nearly identical work performed by Wells for Vaughn when she assisted him with the local high school football team); *see also Knight,* 950 F.2d at 380 (affirming independent contractor status despite training provided by the employer); *Jones v. A.W. Holdings LLC,* 484 F. App'x 44, 47 (7th Cir. 2012) (same); *Am. Inter-Fidelity Corp. for Am. Inter-Fidelity Exch. v. Hodge*, No. 18-cv-04604, 2020 WL 1433783, at *4 (N.D. Ill. Mar. 24, 2020) (finding the "level of skill" factor favored independent contractor status in part because the employer offered minimal training and employee had the prior skills necessary for the job). *Cf. Worth*, 276 F.3d at 263 (emphasis added) ("An individual's unique work skills may indicate independent contractor status. . . . However, if the individual requires *substantial training and supervision*, an employee/employer status is more likely.").) The Court notes as well that while she did not end up working as such, Wells was brought on

for the Veeva event not only as a PA, but also as a makeup artist (a more specialized role).  (Mantha Aff. Ex. 3, ECF No. 76-30; *see also* Vaughn Dep. Tr. 166:19-21, 175:20-25, 411:20–412:10, ECF No. 188-1 (discussing how production assistants are independent contractors and how Wells was to be processed through Mertzcrew, an independent contractor Freeman uses for "gig workers").)  Despite this, the Court is reluctant to say this factor favors independent contractor status when Wells' ultimate job involved straightforward administrative/planning tasks.  This factor is neutral.

The third factor, responsibility for the costs of operation and equipment, favors independent contractor status.  Freeman's extent of expenses on behalf of Wells seemed to be limited to Vaughn's payments for two meals.  (Wells Dep. Tr. 160:2-4, 187:4-9, ECF No. 148-3.)  Wells argues that she did not bear any expenses (aside from her airfare to Orlando and Uber ride to her hotel).  (Pl.'s Resp. 36, ECF No. 170.)  While this may be true, the Court notes that paying for her own airfare and transportation services is not insignificant considering the brevity of her stint with Freeman, and it was Veeva that paid for her hotel room.  As for equipment, Wells seems to focus, in part, on tools provided at "Vaughn's Freeman office" in Evansville, Indiana.  (*Id.*)  However, this was not a Freeman office; rather, the record indicates that this was a personal office, located in a church, used by Vaughn for an assortment of tasks.  (Vaughn Dep. Tr. 407:3-5, 408:2-4, ECF No. 148-1; Wells Dep. Tr. 28:9–29:21, ECF No. 148-3.)  Aside from a single computer that Wells was given access to for a short period in Orlando, the record does not indicate that Freeman provided

Wells with work material or equipment.  Thus, this factor favors independent contractor status.

The fourth factor, the method and form of payment and benefits, slightly favors Wells.  Payment by a lump sum indicates independent contractor status while payment by the hour indicates employee status.  *Worth*, 276 F.3d at 264 (distinguishing between an independent contractor and employee based on whether the individual is paid by time or by commission).  While Wells had no knowledge of any benefits she was to receive from Freeman, (Wells Dep. Tr. 198:18–199:21, 200:11-24, ECF No. 148-3), by all accounts, Freeman was to pay Wells based on an hourly rate, (*see* Mantha Aff. Ex. 3, ECF No. 76-30.)  This factor thus favors employee status.

The final factor, the length of job commitment, clearly favors independent contractor status.  Wells planned to work for Freeman for just over a week.  (Wells Dep. Tr. 79:22-23, ECF No. 148-3.)  Wells likewise had no *specific* expectation of continued work with Freeman after the Veeva event; rather, her expectation was ambiguous and in reference to "potential" work as a PA at other unidentified events. (*Id.* at 200:3-10; *see also EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 750–51 (7th Cir. 1998) (finding length of time factor to favor independent contractor status despite expectation of continued work of employee because employer had made no such commitment and because "expectation did not make him an employee").)

Because most factors including the most pivotal favor independent contractor status, the Court would find that Wells worked for Freeman as an *independent contractor* even if an employment relationship had existed between the parties.

Therefore, Wells' claims under Title VII and Indiana's wage payment statutes do not survive summary judgment.

## 2. Wells' IIED and NIED Claims Against Freeman

Freeman next seeks summary judgment as to Wells' IIED and NIED claims and makes several arguments in support. (Freeman Br. Supp. Mot. Summ. J. 29–35, ECF No. 149.)  However, Wells either completely ignores these arguments or makes no meaningful response to refute them.  The Court addresses these arguments (and whatever counterarguments are present) in turn.  When exercising supplemental jurisdiction, a federal court "does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citation omitted).  Indiana follows the *lex loci delicti* rule when applying choice of law to torts, meaning the law of the state where the tort was committed applies.  *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1164 (Ind. 2002).  As to IIED, the torts allegedly committed by Freeman occurred in Indiana; the parties do not argue otherwise and agree that Indiana law applies.  (*See* Freeman Br. Supp. Mot. Summ. J. 29 n.5, ECF No. 149.)  As to NIED, Wells did not discuss her NIED claims in her opening brief nor cite to any underlying law pertinent to the issue.  (*See generally* ECF No. 170.)  However, like Freeman, she cited to Indiana NIED law in her response.  (ECF No. 185 at 11–12.)  Regardless, the Court notes that no conflict between Indiana and Florida law exists as to the pertinent causes of action, so choice of law is not an issue.  *See Cincinnati Ins. Co. v. Trosky*,

918 N.E.2d 1, 6 (Ind. Ct. App. 2009) ("[A] choice-of-law analysis is necessary only when there is a conflict between the laws of the states in question.").

    i.    IIED.

In order to establish a claim for IIED, a plaintiff must show by a preponderance of the evidence "that the defendant: (1) engage[d] in extreme and outrageous conduct (2) which intentionally or recklessly (3) cause[d] (4) severe emotional distress to another." *Westminster Presbyterian Church of Muncie v. Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013).  "Extreme and outrageous" conduct exists "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (citing Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)).

Wells and Freeman first disagree on the element of intent; however, the Court need not address these arguments because Wells' IIED claim fails as a matter of law based on the absence of any "extreme and outrageous" conduct on the part of Freeman.  Wells alleges that the indisputable facts establish that Freeman did not investigate Wells' allegations of sexual harassment.  (Pl.'s Resp. 46, ECF No. 170.)  However, Wells does not support this statement with evidence from the record; and, the record suggests just the opposite.  (*See* ECF No. 37-17.)  In truth, Wells' IIED claim against Freeman seems to rest entirely on her allegation that Freeman gave false statements in its Statement of Position to the Equal Employment Opportunity Commission ("EEOC") in order to "cover-up the fact that [Wells] was its employee for

purposes of Title VII." (Pl.'s Resp. 48, ECF No. 170.) Wells points to three specific instances of false representations by Freeman before the EEOC: (1) Freeman "created a fake expense report for Vaughn" listing Wells as a business guest for two meals, (*compare* ECF No. 76-14 *with* ECF No. 154-14); (2) Freeman claimed that the "only record" it had of Wells' presence at the Veeva event was the aforementioned expense report, (*cf.* ECF No. 76-3 at 5); and (3) Freeman falsely stated that "with the exception of Vaughn, no one at Freeman knew of [Wells] *at all*" until after receiving Wells' sexual harassment complaint, (ECF No. 76-14 at 4–5,) even though the record indicates otherwise (e.g., as discussed above, LVR's acknowledgment of Wells to Vaughn). But Wells' argument stops here.

Wells does not address any of Freeman's arguments on whether this conduct rises to a level that is "extreme and outrageous." The most Wells says on this element is that "Freeman's actions in this case are reprehensible." (Pl.'s Resp. 49, ECF No. 170.) Yet, simply stating that conduct is reprehensible does not make it so, nor is reprehensible conduct necessarily "extreme and outrageous" for purposes of IIED. *See, e.g., Cullison v. Medley*, 570 N.E.2d 27, 28–29 (Ind. 1991) (affirming summary judgment denial of IIED in case where the defendant confronted the plaintiff in his home, berated the plaintiff, called the plaintiff a "pervert," and shook his gun at the plaintiff). In her Reply, Wells continues to state in conclusory language that Freeman's conduct was "extreme and outrageous," but fails to cite to any law that is on point. (*See* Pl.'s Reply 10, ECF No. 185.) The Court has likewise not found law that suggests that Freeman's conduct, while perhaps calculated, rises to the level of

"extreme and outrageous" as necessary for a successful IIED claim. While Freeman's crafty legal gamesmanship before the EEOC is lamentable and likely made Wells feel betrayed, accused, embarrassed, or otherwise hurt, as a matter of law, the conduct cannot be said to be "extreme and outrageous" based on Indiana jurisprudence. Without a genuine dispute as to the facts underlying this crucial element, Wells' claim of IIED fails as a matter of law.

Accordingly, the Court **grants** Freeman's Motion for Summary Judgment as to Wells' IIED claim.

ii.     NIED.

Freeman likewise seeks summary judgment on Wells' NIED claim. Under Indiana law, a claim for NIED applies only in three circumstances:

> [1] The impact rule applies when the plaintiff suffered a direct physical impact resulting in physical injury. [2] The modified-impact rule applies when the plaintiff suffered a direct physical impact and the defendant's negligence resulted in the injury or death of a third party. [3] Finally, the bystander rule applies when the plaintiff witnessed a relative's death or severe injury or viewed the immediate aftermath of the incident.

*K.G. v. Smith*, 178 N.E.3d 300, 303 (Ind. 2021). The only theory that is potentially relevant to this case is the "impact rule," stemming from Vaughn's alleged sexual assault against Wells. However, to hold Freeman liable, Wells must show that Vaughn's tortious conduct was within the scope of his employment with Freeman. *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (Ind. 2018) ("[A]n employer is liable for employees' tortious acts only if those acts occurred within the scope of employment.").

Wells has made no showing that Vaughn's conduct was within the scope of his employment with Freeman.  To do so, Wells had to show that Vaughn's "injurious act [was] incidental to the conduct authorized" by Freeman or was done to further Freeman's business "*to an appreciable extent.*"  *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008) (emphasis added).  Instead, Wells' only argument as to this issue is that Vaughn's conduct was within the scope of his employment because he went to Wells' hotel room to look at clothing she planned to wear for the Veeva event, where she would be representing Freeman.  (Pl.'s Reply 12, ECF No. 185.)  While ensuring that Wells wore appropriate business attire for the Veeva event *might* be a reasonable undertaking for her "supervisor," at least the alleged act of shaving areas unseeable through such clothing would exceed such reasonable conduct and go beyond Vaughn's scope of employment.  Indeed, it does not seem that wearing lingerie, or taking modeling pictures, or giving a massage was in the scope of any employment for the event.  And even for the conduct leading up to that point, the Court sees no evidence in the record, nor has Wells pointed to any, suggesting that Freeman would ever possibly authorize one of its managers to follow an employee to his or her hotel room after an evening of numerous alcoholic drinks in order to ensure that the employee had "appropriate clothing."  Wells could have simply informed Vaughn of what she would be wearing if her attire was that crucial to the furtherance of Freeman's business.  The idea that a company would implicitly want its managers to go to a subordinate employee's hotel room late at night following an evening of intoxication to "check" that they had appropriate clothing makes no rational business sense at all.

Nor would checking Wells' attire for a day qualify as conduct that is in furtherance of Freeman's event-planning business to an "appreciable extent."  Finally, nothing in the record indicates that Freeman had anything to do with Vaughn's purported modeling opportunities for Wells nor does the record indicate that Freeman authorized any of Vaughn's physical contact with Wells.

The Court therefore **grants** Freeman's Motion for Summary Judgment on Wells' NIED claim.

### 3.  Conclusion as to Freeman's Liability

For the aforementioned reasons, the Court **grants** Freeman's Motion for Summary Judgment, (ECF No. 148), on all claims.  Also, Wells' Motions for Summary Judgment, (ECF Nos. 168, 174), are **denied** with respect to any claims against Freeman.

Freeman is **dismissed** from the case, and the Clerk is ordered to **terminate** Freeman as a defendant in the case.

## B. Vaughn

Vaughn seeks summary judgment on Wells' claims of (1) battery, (2) sexual battery, (3) IIED, (4) and NIED.  Vaughn additionally seeks summary judgment on his asserted counterclaims of (1) defamation and (2) tortious interference.   In response, Wells argues that there is a genuine dispute of material fact that precludes summary judgment on her claims against Vaughn of battery, sexual battery, and IIED, and on Vaughn's defamation counterclaim, and asks the Court to grant summary judgment in her favor on her claim of NIED against Vaughn and on

24

Vaughn's tortious interference counterclaim.   The Court addresses each of these claims in turn.

### 1. Wells' Battery Claim

There is no dispute that the pertinent alleged conduct occurred in Florida; thus, both parties agree that Florida law applies to Wells' tort claims.  "A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent."  *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997) (citation omitted).

> Proof of the technical invasion of the integrity of the plaintiff's person by even an entirely harmless, but offensive contact entitles the plaintiff to vindication of the legal right by an award of nominal damages, and the establishment of the tort cause of action entitles the plaintiff also to compensation for the resulting mental disturbance, such as fright, revulsion or humiliation.

*Id.* (citing Prosser & Keeton on Torts § 9 (5th ed. 1984)).  "[T]he defendant is liable not only for contact[s] which do actual harm, but also for those *relatively trivial ones* which are merely offensive and insulting."  *Id.* (emphasis added).  The intent associated with a battery is *not* the intent to cause harm, but rather, the intent to simply make the contact or touching.  *Id.* ("No evidence of an intention to cause harm is necessary.").  Ultimately, "the test is what would be offensive to an ordinary person not unduly sensitive to personal dignity."  *Id.*

Vaughn argues that Wells cannot establish a claim for battery because Vaughn did not inflict harmful or offensive contact on Wells.  (Vaughn Br. Supp. Mot. Summ. J. 7, ECF No. 141.)  But, as is clear under Fed. R. Civ. P. 56, for Vaughn to succeed on his motion, "there [must be] no genuine dispute as to any material fact."  In this

case, Vaughn admits that on the night of January 19, 2020, he and Wells went to Wells' hotel room following an evening where each of them had numerous alcoholic drinks. (Vaughn Dep. Tr. 243:8-16, 245:6-11, ECF No. 169-1.) Based on Vaughn's recollection of the event, Wells then decided that she needed to shower; she undressed, left the bedroom, and got into the bathtub. (*Id.* at 246:1-13.) At this point in the story, there is a *clear* genuine dispute of material fact relevant to Wells' battery claim. Wells, under oath, claims Vaughn took a razor out of her hands and proceeded to shave and grope her vagina. (Wells Dep. Tr. 168:5-15, ECF No. 148-3.) Vaughn then asked Wells to lay face down on the bed, massaged her, and again groped her vagina numerous times. (*Id.* at 175:5-13.) A reasonable jury could find that such contact would be harmful or offensive to an ordinary person and therefore sufficient to satisfy the requirements for a battery claim. Importantly, however, Vaughn "vehemently denies" these allegations. (Vaughn Br. Supp. Mot. Summ. J. 7 n.1, ECF No. 131.) In other words, these facts are in *dispute*. Their reliability and accuracy are for the trier of fact to decide.

Even if the Court were to ignore the evidence in the record of groping, Vaughn himself still admits that he helped Wells out of the tub, wrapped her in a towel, took her to her bed, and helped her get dressed. (Vaughn Dep. Tr. 246:12-23, 251:13-15, ECF No. 169-1.) A reasonable jury could find that even this contact was harmful or offensive and could hold Vaughn liable for battery.

Vaughn additionally argues that "at no time did [he] believe that his conduct was 'harmful or offensive,'" though he does not cite to any evidence in the record (for

instance, any sworn testimony) in support of this claim.  (Vaughn Br. Supp. Mot. Summ. J. 7, ECF No. 141.)  In any case, as discussed above, his intent to cause harm is irrelevant.  *See Paul*, 696 So. 2d at 1312.  Vaughn also argues that he is entitled to summary judgment because "at no time during the night of the alleged battery, did [Wells] indicate that she was harmed or offended."  (Vaughn Br. Supp. Mot. Summ. J. 8, ECF No. 141.)  Vaughn does not cite to any law on this point, and the Court fails to see how this is relevant to Wells' battery claim.  Wells does not have to *affirmatively* indicate harm or offense to sustain her claim.

Finally, Vaughn urges the Court to consider the Orange County Sheriff's Office Incident Report, where Wells told law enforcement that she "did not feel like she was in danger" and where law enforcement declined to press charges against Vaughn because "[t]he elements of Battery have not been proven."  (ECF No. 142-4 at 3–4.) First, whether Wells felt like she was "in danger" is, again, irrelevant to the definition of battery under Florida law.  *See Paul*, 696 So. 2d at 1312 (emphasis added) ("[T]he defendant is liable not only for contact[s] which do actual harm, but also for those *relatively trivial ones*.").  Additionally, the Court is not bound by law enforcement's preliminary determination that there was insufficient evidence for *criminal* battery based on the sparse facts available to them at the time.[2]  (*See* ECF No. 142-4 at 3 (citing to Florida's criminal battery statute).)  Their determination is not relevant here.

---

[2] Evidence of criminal battery would be analyzed through the lens of the "beyond a reasonable doubt" standard, which is not applicable here.

Viewing the facts of this case in a light most favorable to the nonmovant (Wells), the Court finds that there is a genuine dispute of material fact on Wells' claim of battery. Vaughn's Motion for Summary Judgment is **denied** with respect to Wells' battery claim.

### 2. Wells' Sexual Battery Claim

Vaughn asks the Court to grant summary judgment in his favor on Wells' sexual battery claim because Florida does not recognize a separate tort claim for sexual battery. (Vaughn Br. Supp. Mot. Summ. J. 8, ECF No. 141.) The Court agrees.

In support of her argument that Florida recognizes a civil cause of action for sexual battery, Wells cites to Chapter 772 "Civil Remedies for Criminal Practices" of Florida's statutory code. (Pl.'s Resp. 20, ECF No. 172.) However, Wells' reliance on this statute is misguided. Chapter 772 is Florida's civil RICO statute. Fla. Stat. §§ 772.103–104 (stating the civil causes of action under the chapter, all of which pertain to patterns of criminal activity or criminal enterprises); *see also RLS Bus. Ventures, Inc. v. Second Chance Wholesale, Inc.*, 784 So. 2d 1194, 1196 n.2 (Fla. Dist. Ct. App. 2001) ("In 1986, the civil damages section of chapter 895 [criminal RICO] was moved to chapter 772, because of problems resulting from the inclusion of a civil damages remedy in a criminal statute."); *Bortell v. White Mountains Ins. Grp., Ltd.*, 2 So. 3d 1041, 1044 (Fla. Dist. Ct. App. 2009) (referring to "Florida's RICO laws, chapter 772"). Wells' reliance on Fla. Stat. § 772.18 is without merit; Wells has not alleged claims of a pattern of criminal activity/criminal enterprise by Vaughn that would entitle her to

a remedy under Florida's RICO statute.[3]  Further, the Court has found no case law suggesting recognition of a general civil cause of action for sexual battery in Florida.

Accordingly, Vaughn's Motion for Summary Judgment as to Wells' sexual battery claim is **granted**.  Wells' sexual battery claim is **dismissed with prejudice**.

### 3. Wells' IIED Claim

Vaughn next seeks summary judgment on Wells' claim for IIED.  "To prove intentional infliction of emotional distress, the plaintiff must show: (1) [t]he wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954–55 (Fla. Dist. Ct. App. 2017) (citation omitted).

Vaughn's initial argument that he lacked the requisite intent to be liable because he did not believe that "his conduct would result in emotional distress," (Vaughn Br. Supp. Mot. Summ. J. 9, ECF No. 141), is not dispositive.  Rather, the question is whether there is no genuine dispute of fact as to whether Vaughn *should have known*

---

[3] Even if Florida recognized a civil action for sexual battery, Vaughn would still be entitled to summary judgment.  Under Florida criminal law, sexual battery requires anal or vaginal *penetration*.  Fla. Stat. § 794.011(1)(h).  Plaintiff acknowledges this requirement but does not point to any evidence in the record suggesting penetration occurred.  In fact, Plaintiff seems to have admitted to law enforcement that "there was no penetration." (ECF No. 142-4 at 3.) This is not to brush aside the gravity of conduct that is alleged in this case; however, based on the facts presented, the legal definition of criminal sexual battery under Florida law is not met here.

that his conduct would likely result in emotional distress.  Wells urges the Court to consider the fact that Vaughn knew Wells was intoxicated on the night in question, (Vaughn Dep. Tr. 247:3-7, ECF No. 169-1), and nevertheless groped her vagina multiple times and in multiple locations in the hotel room, (Wells Dep. Tr. 168:5-15, 175:5-13, ECF No. 148-3).  Of course, Vaughn disputes this version of events.  But that is exactly what is before the Court: a *dispute* of material fact.  Further, Vaughn acknowledges that he knew Wells was intoxicated on the night in question yet argues that this is not relevant to whether he "should have known" his conduct would likely result in emotional distress.  (Vaughn Reply 8, ECF No. 187.)  But, at least at this summary judgment stage, there is a genuine dispute of material fact as to whether Vaughn should have known his physical conduct (which itself is disputed) with an intoxicated, young woman in her hotel room would be likely to cause her emotional distress.  Vaughn's assessment that Wells never said "stop" to his conduct is not factually relevant at this stage as, at the same time, he fails to point to any evidence that Wells ever consented to his conduct.  (*See* Vaughn Br. Supp. Mot. Summ. J. 9– 10, ECF No. 141.)  A jury could reasonably find that Vaughn should have known his conduct would have been likely to cause emotional distress, even absent clear refusal on Wells' part.

Vaughn then briefly argues that there is no genuine dispute as to the element of "extreme and outrageous" conduct.  (Vaughn Br. Supp. Mot. Summ. J. 9, ECF No. 141.)  The Court cannot agree.  For this element to be met, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

30

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Deauville*, 219 So. 3d at 955 (citation omitted).  Vaughn simply states in conclusory fashion that his "conduct was not so outrageous as to rise to the level of [IIED]." (Vaughn Br. Supp. Mot. Summ. J. 10, ECF No. 141.)  He offers no legal support as to why this is the case, and he ignores evidence in the record of Wells' version of the facts, specifically those related to his alleged groping of her genitals while she was intoxicated.  (Wells Dep. Tr. 168:5-15, 175:5-13, ECF No. 148-2.)  A reasonable jury could find that the conduct in this case was "extreme and outrageous."

Vaughn finally argues that Wells has no evidence showing that he caused Wells emotional distress and that the emotional distress was severe.  Specifically, Vaughn urges the Court to rule in his favor because Wells' emotional distress is not attributable to him, but rather, has been an ongoing issue for Wells since childhood. (Vaughn Br. Supp. Mot. Summ. J. 10, ECF No. 141.)  The Court is not persuaded by this argument.  It is true that Wells has suffered emotional distress in the past, including issues of anxiety in school and panic related to air travel and crowded areas. (Wells Dep Tr. 216:2-21, ECF No. 142-3.)  However, Wells has pointed to specific evidence (which Vaughn does not address in his Reply) of significant symptoms of emotional distress and changes in medication following the Veeva event.  Namely, Wells points to panic attacks, sleep deprivation, nightmares, flashbacks, concentration issues, and severe anxiety; additionally, Wells had to attend weekly therapy in response to the events that took place. (Wells Dep. Tr. 233:9–234:1, 235:1-

31

19, ECF No. 148-3.)  Wells' dose of sertraline, an antidepressant, has increased from 25 milligrams to 150 milligrams following the events in Orlando.  (*Id.* at 233:25–234:1.)  Bearing this in mind, the Court finds there is a genuine dispute of material fact as to whether Wells has suffered severe emotional distress as a result of Vaughn's conduct.

For the aforementioned reasons, Vaughn's Motion for Summary Judgment as to Wells' IIED claim is **denied**.

### 4. Wells' NIED Claim

Vaughn and Wells have both moved for summary judgment as to Wells' NIED claim.  "In Florida, the prerequisites for recovery for [NIED] differ depending on whether the plaintiff has or has not suffered a physical impact from an external force. If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself.  If, however, the plaintiff has not suffered an impact, the complained-of mental distress must be 'manifested by physical injury,' the plaintiff must be 'involved' in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must suffer the complained-of mental distress and accompanying physical impairment 'within a short time' of the incident." *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (citation omitted).

Wells is only relying on the impact theory.  Vaughn first seems to argue that the "impact" in this case is not sufficient to sustain an NIED claim.  (Vaughn Reply 3, ECF No. 187.)  However, his argument is misguided.  Vaughn attempts to distinguish

*Willis*, the case cited by Wells as well as the Court here, by stating that the impact in *Willis* involved a woman being held at gun point and then being patted down during a robbery.  *Willis*, 967 So. 2d at 850.  Vaughn then admits that the undisputed "impacts" in this case occurred when he helped Wells out of the bathtub, into some clothes, and ultimately into bed, (Vaughn Reply 3, ECF No. 187; *see also* Vaughn Dep. Tr. 246:19-23, ECF No. 148-1), but seems to imply that they are not sufficient impacts because they are not as serious or intense as those in *Willis*.[4]  However, the impacts in *Willis* were *more than sufficient* to satisfy the requirement for an NIED claim. *Willis*, 967 So. 2d at 851; *see also id.* at 850 (citation omitted) ("We have previously stated that for a plaintiff to have endured an impact or contact sufficient to render an action sustainable the 'plaintiff may meet rather slight requirements.'").  All that is needed to establish an impact is that an "outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." *Id.* at 850 (citation omitted).  The undisputed facts establish that such an impact occurred here when Vaughn touched Wells' body.

Vaughn next argues that Wells has not proven that her emotional distress stems directly from the impact of Vaughn helping her out of the bathtub and into bed.  But the heart of the dispute in this "he said she said" case is exactly what happened in Wells' hotel room.  Wells need not show that her emotional distress stemmed only

---

[4] The Court notes that there are other, more significant "impacts" still in dispute here. However, as subsequently explained, the impacts not in dispute are still enough to satisfy the impact requirement for Wells' NIED claim.

from the incidental contact that occurred when Vaughn helped her out of the bathtub and into bed.  Rather, Wells' deposition indicates significantly more contact on her body (specifically, her genital area) applied by Vaughn.  (Wells Dep. Tr. 168:5-15, 175:5-13, ECF No. 148-2.)  Her evidence showing emotional distress can be linked to these potential impacts as well.  However, this is an issue of fact for the jury to determine.

For similar reasons, Wells' argument in support of summary judgment fails.  Wells has pointed to evidence of emotional distress following the incident in Orlando.  This includes a struggle to focus during school, college counseling appointments, nightmares involving Vaughn, weekly therapy involving EMDR (eye movement desensitization and reprocessing), panic attacks, anxiety, and a six times increased dosage of her anxiety medication.  (Wells Dep. Tr. 235:1-7, 235:8-14, 235:19-25, 233:9–234:1, ECF No. 148-3.)  But, at this stage and as discussed above, the only undisputed impact that Wells received from Vaughn was his helping her out of the bathtub and into bed.  Ultimately, a reasonable jury could find that Wells' emotional distress, no matter how significant, does not stem from such incidental conduct.

Accordingly, both Wells' and Vaughn's respective Motions for Summary Judgment as to the NIED claim are **denied**.

### 5.  Vaughn's Defamation Counterclaims

Vaughn seeks summary judgment on his counterclaims for defamation (Count I for libel, Count II for slander).  Vaughn's counterclaims are based on alleged tortious conduct that occurred in Indiana; the Parties agree that Indiana law applies here.

34

As a preliminary matter, Vaughn first argues that Wells did not respond to his counterclaims, and therefore, his allegations are deemed admitted. (Vaughn Br. Supp. Mot. Summ. J. 11–12, ECF No. 141.) However, this is not the case. As Wells notes in her Response, she answered Vaughn's counterclaims, (ECF No. 22), in her Answer dated May 18, 2021, (ECF No. 24). After Wells filed an Amended Complaint, (ECF No. 37), Vaughn made identical counterclaims, (ECF No. 45). Again, Wells filed an identical response. (ECF No. 49.) Ultimately, Wells filed a Second Amended Complaint, (ECF No. 122), which Vaughn responded to with the same exact counterclaims, (ECF No. 130). Wells did not respond to this third iteration of counterclaims, nor did she need to. Vaughn even seems to concede this argument in his Reply. (ECF No. 187.) Seventh Circuit law is clear on this issue. "The purpose of a responsive pleading is to put everyone on notice of what the defendant admits and what it intends to contest." *Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 395 (7th Cir. 2014) (holding that a defendant had not admitted any allegations for failing to respond to a fourth amended complaint). In her first two responses, Wells had properly put Vaughn on notice of what she intended to contest; Vaughn's allegations were therefore not admitted.

Turning to the legal issue at hand, generally, a plaintiff must establish the following elements in an action for defamation: "(1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." *Haegert v. McMullan*, 953 N.E.2d 1223, 1230 (Ind. Ct. App. 2011). But, as is the case here, malice is not a required element in an action for defamation between two private

parties on a matter of private concern.  *Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 489 n.3 (Ind. Ct. App. 2017).  "A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation, or; (4) sexual misconduct." *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. 2000) (citation omitted).  For a plaintiff to succeed on his defamation claim, he has the burden to establish that the allegedly defamatory statement is false.  *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 956 (Ind. Ct. App. 2014).

Vaughn, as counterplaintiff, has not met his burden of showing falsity at this stage.  There is a genuine dispute of material fact as to whether Wells' statements are defamatory.  Vaughn points to two allegedly defamatory statements: (1) a letter sent by Wells to Freeman and (2) a letter sent by Wells to Western Kentucky University.  (Vaughn Br. Supp. Mot. Summ. J. 14, ECF No. 141.)  Both letters state or implicitly describe Vaughn as a "sexual predator," and the Freeman letter in particular makes allegations of "child grooming" (i.e., the process whereby a predator befriends and establishes an emotional connection with a child and their family for the ultimate objective of sexual abuse).  (*See* ECF No. 142-9; ECF No. 142-10.)  Wells argues that there is a genuine dispute of material fact as to the falsity of these allegations.  (Pl.'s Resp. 32, ECF No. 172.)  Vaughn, on the other hand, argues he is entitled to summary judgment because Wells was not a minor at the time of the alleged conduct and because Wells has not made any allegations in her Complaint of "grooming"; therefore, there is no dispute as to the falsity of those statements.

36

(Vaughn Br. Supp. Mot. Summ. J. 14, ECF No. 141.)  But Vaughn's defamation claim is an entirely separate claim from the rest of this lawsuit.  Wells does not have to allege conduct of grooming in her Complaint.  Further, the fact that Wells was 21 at the time of the alleged sexual conduct is not necessarily relevant.  Wells' statements in the letters did not claim Vaughn *sexually assaulted* her when she was a minor; rather, as defined in the letter, Wells was alleging that Vaughn built an emotional connection with her when she was a minor in order to ultimately achieve a sexual objective.  (ECF No. 142-9.)

Therefore, to survive Vaughn's motion, Wells simply needed to identify evidence in the record that could lead a reasonable jury to conclude that her statements regarding Vaughn's alleged grooming and predatory behavior were true.  Wells identified such facts.  Vaughn knew Wells for her entire life.  (Vaughn Dep. Tr. 22:17–23:25, ECF No. 148-1.)  Vaughn's parents were friends with Wells' mother, and Vaughn himself knew Wells' mother his entire life.  (*Id.*)  Vaughn's family and Wells' family attended church together, went on vacations together, and had game/movie nights together.  (*Id.* at 24:11-13; Wells Dep. Tr. 143:24–144:3, ECF No. 148-3; Wells Aff. ¶ 2, ECF No. 148-1.)  During and after her senior year of high school, Vaughn began discussing modeling opportunities with Wells.  (Vaughn Dep. Tr. 329:20-25, ECF No. 169-1.)  Vaughn asked Wells to send him her body measurements so he could track her progress in getting in shape; he also asked for Wells to send pictures of herself in activewear.  (Wells Aff. ¶ 5, ECF No. 171-1.)  Vaughn indicated to Wells the possibility of modeling opportunities with brands (e.g., PINK) with which neither he

nor Freeman had any connection.  (Vaughn Dep. Tr. 330:11-21, ECF No. 169-1.) Vaughn additionally had numerous interactions with Wells via text wherein he asked Wells to send him pictures (some partially nude) of herself in sleepwear and lingerie, purportedly for other modeling opportunities.  (*See, e.g.*, ECF No. 123-1.)

Whether these facts ultimately establish Wells' allegation that Vaughn "groomed" her or that Vaughn is a sexual predator, at this stage, there is a genuine dispute of material fact as to this claim. A reasonable jury could find that Wells' statements in her letters to Freeman and WKU are true.  Vaughn's Motion for Summary Judgment as to his defamation *per se* counterclaims is **denied**.

6.  <u>Vaughn's Tortious Interference with a Business Relationship Counterclaim</u>

Both Vaughn and Wells seek summary judgment as to Vaughn's counterclaim for tortious interference with a business relationship.

The elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Bradley v. Hall*, 720 N.E.2d 747, 750 (Ind. Ct. App. 1999) (citation omitted).  Wells argues, and Vaughn concedes, that Indiana recognizes a sixth element, *illegality*, to successfully prove intentional interference with a *business* relationship.  (Pl.'s Resp. 34–35, ECF No. 175 (citing *Watson Rural Water Co. v. Ind. Cities Water Corp.*, 540 N.E.2d 131, 139 (Ind. Ct. App. 1989).)  Wells thus believes she is entitled to summary judgment because Vaughn has not pointed

to any evidence suggesting that Wells' conduct was illegal.  (*Id.* at 35.)  However, Indiana courts treat a claim for tortious interference with a business relationship as a claim for tortious interference with a *contractual* relationship when the underlying employment relationship is one based upon a contract terminable at will, as is the case here.  *Bradley*, 720 N.E.2d at 751 (treating a tortious interference with a business relationship claim as one for tortious interference with a contractual relationship and accordingly not requiring a showing of illegality).  A tortious interference claim based on a contractual relationship does not require a showing of illegality (i.e., only the five elements discussed above are needed).  *Id.*  Further, there is a genuine dispute as to whether Wells' communications with Freeman were made to intentionally interfere with Vaughn's relationship with Freeman (as once again, the dispute stems from what happened in Orlando).  (*See* Pl.'s Reply 5, ECF No. 193.)  If a jury finds Wells is lying about the alleged sexual assault, then it could find that her communications with an employer, Freeman, falsely describing Freeman's employee, Vaughn, as a sexual predator qualify as intentional acts of interference with a contractual relationship.  Wells' argument for summary judgment on this claim therefore fails.

Because illegality is not a required element here, Vaughn needed to point to facts not in dispute that prove the remaining five elements of his claim in order to succeed on summary judgment; he has not done so.  As with most of his other arguments, the genuine dispute of fact as to what occurred in Orlando precludes Vaughn's motion.  For example, Vaughn argues that the fourth element, "absence of justification," is

met as to Wells' "interference" with Vaughn's employment/contractual relationship with Freeman because Wells' letter to Freeman was defamatory and was sent for the sole purpose of "marring Vaughn's professional reputation." (Vaughn Reply 5, ECF No. 187.) However, if Wells' version of events is true, this letter, sent as a preliminary communication to Freeman prior to her filing of an EEOC claim, would indicate an alternate reason. In this case, Vaughn's claim for tortious interference with a contractual relationship would fail. Similarly, her letter sent to WKU could find justification in a desire to ensure her safety there as a student. (*See* WKU Letter, ECF No. 142-10.) It is not for the Court to resolve this factual dispute at this stage.

For the reasons discussed, both Wells' and Vaughn's cross Motions for Summary Judgment as to Vaughn's tortious interference with a business relationship counterclaim (which the Court has treated as a claim for tortious interference with a contractual relationship) are each **denied**.

## IV.    Conclusion

For the aforementioned reasons, the Court **grants** Freeman's Motion for Summary Judgment, (ECF No. 148), on all claims. Wells' Motions for Summary Judgment, (ECF Nos. 168, 174), are **denied** with respect to any claims against Freeman. While there are no remaining claims against Freeman, Freeman is not yet dismissed from the case pending resolution of the Motion for Sanctions, (ECF No. 219), filed against it.

Vaughn's Motion for Summary Judgment, (ECF No. 140), is **denied** with respect to Wells' battery claim.

Vaughn's Motion for Summary Judgment, (ECF No. 140), as to Wells' sexual battery claim is **granted**. Wells' sexual battery claim is **dismissed with prejudice**.

Vaughn's Motion for Summary Judgment, (ECF No. 140), as to Wells' IIED claim is **denied**.

Wells' and Vaughn's Motions for Summary Judgment, (ECF Nos. 168, 174, 140), as to Wells' NIED claim are each **denied**.

Vaughn's Motion for Summary Judgment, (ECF No. 140), as to his defamation *per se* counterclaims is **denied**.

Wells' and Vaughn's Cross-Motions for Summary Judgment, (ECF Nos. 168, 174, 140), as to Vaughn's tortious interference with a business relationship counterclaim (which the Court has treated as a claim for tortious interference with a contractual relationship) are each **denied**.

As a result, all claims between Wells and Vaughn except for Wells' sexual battery claim will proceed to trial. The Magistrate Judge is requested to meet with the parties to discuss settlement prior to trial.

Because all claims against Freeman are dismissed, Freeman's pending motions (ECF Nos. 194, 196, and 199), with one exception (ECF No. 202), are **denied as moot**. The Court defers ruling on Freeman's Motion to Maintain Document Under Seal. (ECF No. 202.)

**SO ORDERED**.

Date: 12/16/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to counsel of record by CM/ECF.