# EXHIBIT A

*Amanda L. Pfeffer, PSYD., LLC.*

*P.O. Box 39323, Indpls, IN, 46239 · (801)696-8932 · pfeffera0430@gmail.com*

## WORK PRODUCT: WELLS, et al v. THE FREEMAN COMPANY AND VAUGHN

### IDENTIFYING INFORMATION

| | |
|---|---|
| **Name:** | Wells, et al. v. The Freeman Company and Vaughn |
| **Referred By:** | Mary Lee Schiff, Attorney |
| **Evaluator:** | Amanda L. Pfeffer, Psy.D. HSPP |
| | Licensed Clinical Psychologist |
| **Date(s) of Review:** | 05/09/2022 |
| **Date of Work Product:** | 05/11/2022 |
| **Date of Work Product:** | 05/26/2022 |

### Billable Hours:

| | | |
|---|---|---|
| 05/09/2022 | 8:30a – 11:58a | 3.50 Hours |
| | 12:15p – 4:26p | 4.00 Hours |
| 05/10/2022 | 8:32a – 12:09p | 3.50 Hours |
| 05/26/2022 | 1:14p – 3:18p | 2.00 Hours |

| | |
|---|---|
| **Total Billable Hours:** | 13.00 Hours |
| **Retainer Received:** | $1800.00 |
| **Invoice Amount Due & Received:** | $675.00 |
| **Invoice Amount Due:** | $450.00 |

Records Reviewed:
Lexi Wells; Allegation Documents
Tim Vaughn's / Freeman's Response Documents
Medical/Counseling Records of Lexi Wells
Julie Wells' Text Messages
Miscellaneous
Deposition of Tim Vaughn Volume I and II

Relevant Literature Areas Reviewed:
Models/Theories of Sexual Grooming
Offense Process and Sexual Grooming
Sexual Exploitation



Exhibit 195
Witness Pfeffer
Date 7·29·22 SM

**CONFIDENTIAL**

**PLF001419**

Drug Facilitated Sexual Assault
Posttraumatic Distress
Association for the Treatment (and Prevention) of Sexual Abusers

## Reason for Referral:

To provide an unbiased, expert opinion on the case as related to grooming, manipulation, and dynamics of the relationship.

## Relevant Case Facts:

Date of Alleged Incidents: 1/15/2020 - 1/20/2020
Ms. Wells DOB: ████████████████
Mr. Vaughn DOB: ██████████████
Ms. Wells' Age at January 2020: ████████████
Mr. Vaughn's Age at January 2020: ████████

## General Response:

The following is based upon the review of data received:

In regards to the case involving Ms. Wells versus Mr. Vaughn, it was noted, "In many sexual abuse cases the abuser is a family member or trusted family friend." In response to this, it is foundationally important to note, it is widely acknowledged in the scientific literature regarding sexual offending that most victims indeed know their abuser; it is a myth (which is often reinforced by lay stereotypes of sexual offenders) that strangers are the biggest risk for perpetrating sexual assault or abuse. Research indicates that 80 percent, or 8 out of 10, sex abuse victims know their abuser. In the United States, for women, it is estimated 75% knew their perpetrator; while this statistic does not indicate the presence or lack of grooming, it does indicate the high rate of perpetrators who are known to the victim.

## Grooming:

In order to adequately address this case, a brief review of grooming behavior as supported by the scientific literature is warranted. The behavior of grooming, or sexual grooming, is considered part of the overall sexual abusing process and hence the field considers understanding the grooming process, and the ability to identify grooming behavior, as crucial to the prevention of sexual abuse. It is however, much easier to identify sexual grooming following the commission of a sexual offense than prospective identification. This is such as the behavior utilized to groom a victim for sexual abuse is not dissimilar to innocent behavior intended to broaden a person's experience or characteristic of adult courtship; the critical difference is in the motivation underlying the behavior. It should be noted, the grooming process used by aggressors or offenders on children and adults is fundamentally the same with manipulation tactics and preparation for a specific goal used.

The literature has identified different types of sexual grooming and these types primarily include self-grooming, grooming the environment and significant others, and grooming the potential victim. Self-grooming refers to the cognitive distortions (justification and denial) that offenders or

aggressors use for their own behavior. It is these very distortions offenders often reference in the treatment process, and self-grooming plays a role in moving the individual from being motivated to sexually abuse to the manipulation of a potential victim and engaging in the abuse. It is important to note, those who sexually abuse are not the only persons to harbor these maladaptive implicit theories (or cognitive distortions). For instance, many persons hold the maladaptive implicit theory that others are at most risk for sexual abuse from strangers which is inconsistent with the literature though is easier to believe than research findings that consistently support family and friends are the most common offenders. Maladaptive implicit theories (self-grooming) assist in sheltering those who sexually abuse from the harsh reality; it is easier to believe 'I was seduced' than accepting 'I sexually abused another.'

Grooming the environment and significant others refers to the behavior utilized to gain access to the potential victim. The interactions an offender or aggressor has with others surrounding a potential victim, particularly those who are significant to the potential victim, are aimed at providing or creating an opportunity to access and abuse the potential victim. As such, offenders or aggressors tend to be charming, very helpful, and have 'insider status'; in other words they begin to position themselves as being inside the inner circle of connections with others in the potential victim's life. This is important in order to gain access to the potential victim and also to attempt to limit credibility if disclosure is made.

Finally, grooming the potential victim refers to behavior utilized by one individual to prepare or prime another for a certain end-goal. Physical grooming refers to the systematic and gradual sexualization of a relationship while psychological grooming is the means used to achieve the increased sexualization. Trust is built, the potential victim is made to feel 'special' early on via the use of compliments and flattery, and then boundaries are violated. Conversations tend to become more sexual, desensitization to, or normalization of, the sexualized behavior is achieved via beginning with non-sexual behavior that gradually increases in sexualization. The intentions are to achieve compliance from the potential victim as well as to overcome any resistance and avoid disclosure. Isolation from confidants, reinforcement of 'keeping secrets', and the gradual increase of the sexualization of the relationship are all components of grooming the potential victim.

Overall, the process of sexual grooming is generally not aggressive in nature. Grooming behavior (which has also been referred to as intimate behavior and has been compared to the seductive behavior in the adult courtship process) is employed to avoid disclosure and (legal) conviction. The fear of disclosure is known to affect how and when an individual victimizes another individual (in relation to sexual abuse), and hence the very nature of the grooming behavior implies persons using such behavior would be less likely to be reported. Furthermore, sexual grooming is not an impulsive act but rather it can occur over a period of weeks, months or even years. Of importance in the realm of sexual abuse and assault, is the opportunity to offend; grooming has been argued as the method in which this opportunity is created. In a review of the literature regarding theoretical considerations of grooming, it is proposed grooming is the process by which a person prepares a potential victim (often a child, meaning an individual under the age of 18) significant adults, and the environment for the abuse of a potential victim. Goals include gaining access, gaining compliance, and maintaining secrecy. The process may be utilized to justify or deny actions of abuse or assault for the offender or aggressor. However, it is noted proving beyond a reasonable doubt that the ambiguous behavior of sexual grooming is sexually motivated is a most complicated and at times most certainly arduous task as the defining factor lays largely in the motivations underlying the behavior.

CONFIDENTIAL                    PLF001421

Therefore, in light of the brief review noted above, in response to sexual grooming in the current case (manipulative behavior to gain access and isolate, sexual exploitation, gaining trust PRIOR TO alleged incidents, preying on vulnerabilities, wearing down resistance and inhibitions, and reinforcement of secrecy/silence), it is the opinion of this evaluator that such behavior can most certainly be interpreted from the documents reviewed, especially if the events occurred as Ms. Wells disclosed, however the latter is unknown to this evaluator and there is no criminal charge (at minimum a charge, even if dismissed) to support. Further, the intentions behind the behavior of Mr. Vaughn are largely unknown to this evaluator. The crux here is, though the behavior evidenced in the documents reviewed is largely consistent with characteristic grooming behavior known to be a crucial process to sexual assault or abuse, distinguishing between sexually motivated behavior from non-sexually motivated behavior (in the actions PRIOR TO the alleged assault) is important as essentially the behavior can be the same despite the differing motivations.

While it is clear Mr. Vaughn engaged in behavior to increase his access to, and isolate, Ms. Wells, his intentions motivating this behavior are largely unknown to this evaluator as this evaluator has neither interviewed nor evaluated Mr. Vaughn. Further, it is clear Mr. Vaughn engaged in behavior to gain trust from Ms. Wells PRIOR TO the alleged incidents at issue in this case though again his intentions motivating this behavior are largely unknown to this evaluator. In addition, it is clear Mr. Vaughn engaged in behavior to wear down resistance and inhibitions, though again his intentions motivating the behavior are largely unknown to this evaluator. Finally, it is clear Mr. Vaughn engaged in behavior to reinforce secrecy and silence of Ms. Wells regarding their interactions and content of their discussions/images sent via text message, though again his intentions motivating this behavior can only be assumed in light of the evidence reviewed.

Taken together, Mr. Vaughn's behavior of increasing access to Ms. Wells, isolating Ms. Wells, gaining trust from Ms. Wells prior to the alleged incidents at issue, and reinforcing secrecy and silence all fit within characteristics of grooming behavior as highlighted in the literature, however; this evaluator can only speculate as to Mr. Vaughn's intentions motivating his behavior which is consistent with the research supporting the identification of grooming behavior prospectively as a much more difficult task than retrospective identification. The literature has attempted to define grooming behavior in a universal manner (applicable to varying groups/type of behavior) and as such has defined grooming as a series of goal-directed behavior that collectively shares the intention of prepping a specific person, when that person's compliance or submission is needed or advantageous in achieving an exploitative or illegal goal (Elliott, 2015). In the current case, evidence can certainly support Mr. Vaughn engaged in a series of behavior to prep Ms. Wells as her compliance or submission was advantageous/needed IF the goal was indeed to achieve sexual gratification. In absence of data supporting either the presence or absence of this goal, determination of the presence of grooming behavior beyond a reasonable doubt is inconclusive.

The remaining questions as related to sexual exploitation and preying on vulnerabilities involve additional considerations as they are related to consensual issues and balance of power. Sexual exploitation is defined as "Actual or attempted abuse of a position of vulnerability, power, or trust for sexual purposes, including but not limited to profiting monetarily, socially or politically from the sexual exploitation of another" (World Health Organization). Individuals who sexually assault have been supported in the research to prey on vulnerabilities inclusive of individuals who have been previously sexually abused, individuals who lack a supportive environment or positive support system, and individuals who struggle with chronic low self-esteem. It is the opinion of this evaluator Ms. Wells and

Mr. Vaughn were not in a relationship of equal power, regardless of any sexual activity or motivations present or not. Though both Mr. Vaughn and Ms. Wells are considered legal-age adults of consent in the state of Indiana at the time of the alleged incidents at issue in this case, the relationship prior to and during any interactions that occurred throughout this case is characterized by an unequal balance of power. Mr. Vaughn was in a position of trust and Ms. Wells in a position of vulnerability within the context of their relationship. This gives Mr. Vaughn the upper hand, the power, in the relationship. He was a friend of the family, a peer of Ms. Wells' mother, and viewed by Ms. Wells as an 'uncle' which regardless of the connotation of 'family member' in the term of 'uncle' clearly places Mr. Vaughn in the perception of Ms. Wells as an adult with superiority, or superior status, over her; he was not viewed as a 'cousin' or a 'nephew' or a 'peer' but rather an uncle, or a person of 'higher' adult status. In addition, within that context, Mr. Vaughn's relationship with Ms. Wells as evidenced in the documents related to this case, is characterized by an unequal balance in power further in that he held the keys, in Ms. Wells' perception, to an aspiration of hers which was to engage in the modeling industry. While she was attempting to reach this aspiration for herself, Mr. Vaughn was the person she viewed as making that a reality for her; this places him in a position of power. Much like one would want to impress or satisfy a modeling scout, or much like one would follow the lead or advice of a modeling coach, Ms. Wells viewed Mr. Vaughn as this person for her.

Furthermore, again within the context of the already highlighted dynamics, Mr. Vaughn's relationship with Ms. Wells is characterized by an additional unequal balance of power during the interactions that occurred over the course of January 15th - 20th of 2020 as it was within this time frame the relationship now needs to be considered within an additional context of a supervisor-supervisee. During this time frame Ms. Wells was in the role of an employee or supervisee of Mr. Vaughn who had offered her the role of his production assistant on a job. Again, as one in general aims to please or satisfy a supervisor in general in most positions of employment, this dynamic represents an unequal balance of power between two individuals (regardless of age and regardless of perceptions) in a relationship (that of supervisor-supervisee). As an 'uncle' Mr. Vaughn was in a position of superiority to Ms. Wells, as the keyholder to a modeling career Mr. Vaughn was in a position of superiority to Ms. Wells, and as her supervisor Mr. Vaughn was in a position of power over Ms. Wells.

Taken together, the relationship between Ms. Wells and Mr. Vaughn most certainly included an unequal balance of power with Mr. Vaughn clearly holding the power in the relationship even while accounting for the legal age of both parties. Therefore, while it can be argued Ms. Wells 'consented' to the issues at hand in this case, based on the single fact she was of the legal age of consent in the state of Indiana (and the state of Florida while there), the factors that do not constitute consent need to be addressed. Consent is not present if force or intimidation is involved, consent cannot be assumed based on dress or because consent was previously provided, consent is not present simply because other activity was consented to, and consent is not present if it is not given freely, willingly, and explicitly. Based on the dynamics of the relationship supporting an unequal balance of power, the position of trust established by Mr. Vaughn in the relationship as a whole, Ms. Wells' perception of Mr. Vaughn as an uncle, and the supervisor-supervisee dynamic present, explicit consent cannot clearly be indicated. Regardless of what interactions occurred or did not occur in relation to the issues at hand in this case (in other words regardless of the veracity of Ms. Wells' claims or the veracity of Mr. Vaughn's claims in regards to what activity occurred) the relationship between Ms. Wells and Mr. Vaughn is certainly not characterized by equal power and status.

**Expectations of Behavior:**

CONFIDENTIAL            PLF001423

In relation to the case of Ms. Wells versus Mr. Vaughn, of the questions to be considered, many of these questions involve issues regarding Ms. Wells' behavior.

Again, the unequal balance of power, and the relationship dynamics as a whole need to be considered when addressing the points listed above as well as the literature addressing victim response. Most basically, on a literal level, if it is the expectation Ms. Wells would have 'resisted' Mr. Vaughn, then there needs to be present an act or behavior supporting the use of force to be resisted. Neither Ms. Wells nor Mr. Vaughn report the use of force within any documents reviewed by this evaluator. It is unclear to this evaluator then what Ms. Wells should be expected to resist with regards to specific or forceful behavior on the part of Mr. Vaughn. It can be argued this is the very function of grooming; nonaggressive desensitization to the sexualization of a relationship increasing compliance and avoiding disclosure.

Secondly, it is highlighted, the lack of physical or verbal resistance does not automatically imply consent. With regards to the supposed expectations for Ms. Wells to simply get up and walk away from dinner, instruct Mr. Vaughn to leave her hotel room, say no in response to a request for measurements or to confide in her parents; to hold these expectations would be erroneous and superficial in nature. For instance, Ms. Wells was informed by Mr. Vaughn her measurements where needed for purposes related to the needs of PINK and Bondy; two clients Mr. Vaughn falsely informed her he had secured and two companies Mr. Vaughn falsely informed her were potentially interested in her as a model. Mr. Vaughn was in a position of trust with Ms. Wells, he held the power in the relationship, and he intentionally provided her with misinformation to validate his request for her measurements; she believed him, was in a position of vulnerability to do so, and had no evidence not to believe him. One may ask oneself; is the expectation to 'second-guess' or 'fact-check' a family friend or 'uncle' synonymous to the expectation to do so for a stranger? The expectation of resistance would be much different had Mr. Vaughn been a stranger or an equal peer to Ms. Wells, and had his communication to her been truthful (such as simply stating 'send me your measurements' as opposed to the measurements being needed for a very specific, though truthfully nonexistent, client that is a lingerie company requiring models).

As related to confiding in her parents, there is no evidence presented to this examiner to support why Ms. Wells should be expected to confide in her parents regarding the nature of the relationship, given the context of the relationship between Ms. Wells and Mr. Vaughn, as well as Ms. Wells' parents and Mr. Vaughn. Mr. Vaughn was not a stranger to Ms. Wells. Mr. Vaughn was not a stranger to Ms. Wells' parents. Furthermore, failure to meet any superficial expectation of 'you should have said something to your parent' does not equate to lack of accountability for Mr. Vaughn with respect to his own choices and actions. Offenders or aggressor of sexual assault, sexual abuse, or sexual harassment are not excused from their own behavior or choices based on whether or not an alleged victim did or did not disclose when interactions in the relationship were occurring. In other words Ms. Wells does not hold the responsibility for Mr. Vaughn's actions because she did not tell a parent. Failure to disclose does not equate to responsibility for another's actions or choices. Regarding the expectation Ms. Wells would not have invited Mr. Vaughn to her hotel room, again this is related to the trust previously established in the relationship by Mr. Vaughn; he was not a stranger, Ms. Wells knew him, her family knew him, and she trusted him as an adult of higher status (an uncle, a leader/keyholder in her aspiring field, and a supervisor). Finally, regarding the expectations Ms. Wells need simply to walk away at dinner or instruct Mr. Vaughn to leave her hotel room, again the dynamics of the relationship need to be considered. In the context of dinner specifically Ms. Wells

**CONFIDENTIAL**

was participating at this point as a supervisee for a supervisor on a business trip which is previously complicated by Ms. Wells participating in a relationship with an unequal balance of power given her perception of Mr. Vaughn as an uncle and as the keyholder to unlocking her career aspirations of modeling. Within the context of two colleagues at a business dinner, without the previous history of an extensive relationship characterized by an unequal balance of power, and without the dynamic of one individual potentially being the sole reason for the other individual's future occupational success the expectation of simply walking away would be much different.

The literature supports, contrary to the popular myth that a victim of sexual assault or harassment will flee or fight, common responses to sexual assault often include fear (stiff, frozen, not knowing how to react or what to do), tearfulness, self-blame (it is my fault, I'm not mature enough, I'm an adult, I trusted him, I put myself in that position), isolation, and somatic reactions (often vague such as headaches or gastrointestinal complaints). The literature supports a 'freeze' response in reaction to unwanted sexual activity or experiences. In this 'freeze' response, an individual is physically incapable of resistance due to the survival response of 'freeze', also known as tonic immobility which has been demonstrated to be a human reaction strongly associated with sexual assault (Kalaf, et al., 2017). This 'freeze' response is quite common, contrary to the erroneous belief 'if she didn't resist she must have wanted it' or 'if she didn't say no, she wanted it.' Furthermore, when experienced, as opposed to the 'fight' or 'flee' response, the 'freeze' response victim is often subjected to higher levels of victim-blaming and negative judgment from others.

**Role of Alcohol:**

In relation to the case of Ms. Wells versus Mr. Vaughn, of the questions to be considered, a few of these questions involve issues regarding alcohol use.

It is noted this evaluator was not present during the time of the alleged issues at hand nor has this evaluator assessed either Ms. Wells or Mr. Vaughn with respect to alcohol or other substance use history. Further, the blood alcohol level of Ms. Wells or Mr. Vaughn at the time is unknown to this evaluator. With regards to the literature related to the involvement of drugs and alcohol in drug facilitated sexual assault or abuse, it is widely accepted numerous drugs (including alcohol) can be misused to provide a sedation effect on people or to lower inhibitions of people. In many studies assessing the use of drugs to facilitate sexual assault, the drugs are voluntarily consumed, meaning there is no covert measures taken to provide the individual with the substance. However, voluntary consumption of a drug, including alcohol, can most certainly still result in sedating effects, decreased motor control, reduced clarity in cognition, and lowered inhibitions. Alcohol intoxication has been supported to reduce efficiency in a wide range of activities including behavior control.

The literature supports only a small proportion of alleged drug-facilitated sexual assault incidents are attributable to covert drugging of an individual. However, when assessing for drugs and/or alcohol as a factor in sexual assault, there is widespread detection of drugs and/or alcohol in samples taken from alleged victims of sexual assault, with alcohol and cannabis the most commonly detected (Beynon et al, 2008). The literature is widely in agreement that the consumption of alcohol is associated with a greater risk of being sexually victimized (Beynon et al., 2008, Testa & Livingston, 2009). It is widely supported intoxication from alcohol affects an individual's ability to identify risk, lowers inhibitions, and affects one's perception of reality. One may extrapolate, as exemplified in the research by Beynon et al., the reasoning behind the legal threshold of blood alcohol concentration

levels for driving to be set as such due to the level of impairment sustained by alcohol consumption equating to that level. In other words, impaired perception, lowered alertness, slowed reaction time, reduced judgment, and etc. begin to occur as alcohol is consumed and the blood alcohol concentration level increases; hence the implementation of blood alcohol concentration levels for legal driving. Again, though the blood alcohol level for Ms. Wells or Mr. Vaughn is unknown to this evaluator, it is known that alcohol was consumed, and both Ms. Wells and Mr. Vaughn report Ms. Wells was intoxicated. Therefore, it is implied her judgment of risk, perception of events, and inhibitions were lowered. Further, the literature supports a positive association between drinking and sexual victimization.

**Mental Health Damages:**

In relation to the case of Ms. Wells versus Mr. Vaughn, of the questions to be considered, one involves the issue of the effects of emotional damages.

The effects of Posttraumatic Stress Disorder (PTSD) are both acute and chronic. Individuals who have a history of childhood emotional problems or prior disorders (such as depressive or anxiety disorders) are at greater risk of developing PTSD. In addition, environmental factors such as lower education, lower SES, exposure to prior trauma, lower intelligence, and a family psychiatric history are at greater risk for developing PTSD; it is noted social support prior to the exposure to a traumatic event is a known protective factor. Finally, female gender and younger age at the time of exposure increase risk for the development of PTSD. The severity of the trauma is linked to the likelihood of PTSD development. The effects of PTSD include social, physical, and occupational impairments for the person. Impaired functioning is observed across many domains including interpersonal, developmental, educational, social, and occupational domains.

Psychotherapy, many times in conjunction with medication management, is needed to alleviate symptoms of PTSD and these services certainly have considerable economic costs to the individual. Acutely, individuals with PTSD experience intrusive symptoms (flashbacks and nightmares), avoidance symptoms, and hyperarousal symptoms (hypervigilance, hyperactivity, decreased attention/concentration, restlessness). These symptoms interfere with the person's daily functioning or his/her ability to complete activities of daily living; work may be missed due to the inability to function, classes may be missed due to the inability to function, if activities of daily living are attended the effectiveness of engagement in these activities is decreased due to difficulties in concentration and attention disrupted by intrusive recollections of the trauma. Further, the negative alterations in cognitions symptomatic of PTSD (such as significantly increased negative emotional states of fear or guilt, or shame or confusion) serves to affect one's ability to effectively engage in activities of daily living. Social relationships are negatively affected and social withdrawal is likely; social withdrawal tends to result in substantial interpersonal problems for the individual as well as additional distress.

Anxiety is often prominent in most social situations for persons with PTSD, the world is perceived as dangerous, and even persons in a support network can be viewed as threats to personal safety. Anger and irritability are often manifested in response to social situations, triggered by a perception the environment is malevolent in nature or threatening. The difficulties cognitively and affectively in managing these symptoms in daily life can lead to increased risk of suicide. Chronically, individuals with PTSD need to work therapeutically to restore adaptive cognitions and schemas as related to

**CONFIDENTIAL**

trust and self-worth. This therapeutic work can only be completed once more acute and functionally impairing symptoms (intrusive symptoms, avoidance symptoms, hyperarousal symptoms) are addressed and controlled. Therefore, addressing cognitive schemas or scrip·s regarding boundaries, who to trust and when to trust, the intentions of others in general, and one's own self-worth and self-esteem, tend to be more long-term goals for patients with PTSD and can require therapeutic work that extends beyond the immediate treatment of more acute, overt symptoms.

Respectfully Submitted,

*Amanda 2 Pf Psyd HSPP*

Amanda L. Pfeffer, Psy.D., HSPP
Licensed Clinical Psychologist

**CONFIDENTIAL**            **PLF001427**